IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO.: 24-CR-092-CRC |
| v. | |
| CURTIS LOGAN TATE, | 18 U.S.C. §§ 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon) |
| Defendant. | |

**STATEMENT OF OFFENSE**

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, CURTIS LOGAN TATE, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

*The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

2. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

3. On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States

Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

5. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

6. At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7. Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Tate's Participation in the January 6, 2021 Capitol Riot*

8. In January 2021, the defendant, TATE, lived in Jeffersonville, Indiana. On or about January 4, 2021, TATE and a friend traveled from Indiana to Washington, D.C. TATE planned to attend a political rally dubbed "Stop the Steal" in protest of Congress' certification of the Electoral College vote.

9. On or about January 6, 2021, TATE attended the rally in Washington, D.C. with a friend and later marched with the crowd to the U.S. Capitol grounds. TATE was wearing a black jacket, green tactical vest, green pants, and black knit cap. TATE was carrying a metal baton that he brought with him to Washington, D.C.

10. When TATE arrived at the U.S. Capitol on January 6, 2021, a large crowd had assembled on the restricted grounds surrounding the U.S. Capitol building. TATE observed that the building was closed to the public and law enforcement officers were actively attempting to keep the crowd from entering the building.

11. At approximately 2:05 p.m., TATE was located near the Lower West Terrace of the Capitol grounds. There, TATE urged others in the crowd to move forward, yelling, "Keep going!" TATE also posted a video on his Instagram social media account depicting the Lower West Terrace and inauguration scaffolding with a caption, reading, "Before the first breach."

12. TATE advanced to the front of the crowd at the Lower West Terrace. TATE used the metal baton that he had brought with him to strike Metropolitan Police Department (MPD) Officer G.N. in the hand. In response, MPD Officer J.G. sprayed TATE with pepper spray and TATE retreated.

13. TATE remained near the Lower West Terrace after the assault on Officer G.N. There, TATE posted a second video of himself on Instagram with a caption, reading, "POST 1ST MACING." In the video, TATE displayed the same metal baton that he had used to assault Officer G.N., and TATE yelled, "We're tearing this motherfucker down!"

14. TATE remained near the Lower West Terrace where he uploaded a third video of himself to Instagram with a caption reading, "POST 2ND TEAR GAS." In the video, TATE displayed the metal baton again, and TATE yelled, "Push forward! Our house!" Beginning at approximately 2:42 p.m., numerous members of the mob attacked members of the United States Capitol Police (USCP) and MPD who were lawfully engaged in the performance of their official duties defending an entrance to the U.S. Capitol on the Lower West Terrace known as "the tunnel." Over the course of more than two hours, members of the mob threw items at police, struck police with items, sprayed police with chemical irritants, pushed against the police and stole items from the police defending the tunnel.

15. At approximately 2:43 p.m., TATE approached the entrance to the tunnel. Inside the tunnel, USCP and MPD officers had formed a line to prevent rioters from breaching the Capitol

building. TATE entered the tunnel closely behind the initial group of rioters who had entered the tunnel. TATE brandished the metal baton over his head as he entered.

16. Inside the tunnel, TATE uploaded a fourth video to his Instagram account with the caption, reading, "FUCK ALL THESE GOVERNMENT OFFICIALS."

17. TATE stood at the entrance to the tunnel and waved others outside to enter.

18. At approximately 2:57 p.m., TATE brandished the metal baton above his head and charged towards the line of police officers inside the tunnel who were protecting the Capitol Building. TATE repeatedly struck USCP Sergeant A.G. in the helmet with the metal baton. In response, USCP Officer W.B. sprayed TATE with pepper spray and TATE retreated out of the tunnel.

19. At approximately 4:12 p.m., TATE returned to the steps of the tunnel.

20. At approximately 4:28 p.m., TATE picked up a black speaker box from the ground. The speaker box was approximately 12 inches wide and 18 inches long. TATE threw the speaker box and struck an office window located to the left of the tunnel entrance. The strike caused a crack that was already in the window to expand.

21. At approximately 4:31 p.m., TATE threw a black speaker box, which was approximately the same size as the speaker box described above, at police officers who were protecting the entrance to the tunnel. The speaker box struck MPD Officer S.S. in the left arm. TATE also threw a shoe at Officer S.S.

22. After the above assault on Officer S.S., TATE assisted others passing objects through the crowd. Certain objects were later used as improvised weapons by rioters in the tunnel, including a broken table leg and a floor lamp. TATE also assisted by passing a long piece of lumber toward the entrance to the tunnel.

23. At approximately 4:34 p.m., TATE threw the broken table leg at police officers who were protecting the entrance to the tunnel.

24. At approximately 5:01 p.m., TATE threw a floor lamp at police officers who were protecting the entrance to the tunnel.

25. After the above assaults, TATE stood at the entrance to the tunnel and brandished a black nightstick over his head in a threatening manner at police officers.

### *Elements of the Offenses*

26. The elements of 18 U.S.C. §§ 111(a) and (b) are as follows:

- First, the defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with Officer G.N., an officer from the MPD; Sergeant A.G., an officer with USCP; and Officer S.S., an officer with MPD.

- Second, the defendant did such acts forcibly.

- Third, the defendant did such acts voluntarily and intentionally.

- Fourth, Officer G.N., Sergeant A.G., and Officer S.S. were officers or employees of the United States who were then engaged in the performance of their official duties or assisting officers of the United States who were then engaged in the performance of their official duties.

- Fifth, the defendant made physical contact with Officer G.N., Sergeant A.G., and Officer S.S., who were officers or employees of the United States who was then engaged in the performance of his official duties or assisting officers of the United States who were then engaged in the performance of their official duties, or acted with the intent to commit another felony, to wit, interference with a law enforcement officer during a civil disorder, in violation of 18 U.S.C. § 231.

- Sixth, in doing such acts, the defendant intentionally used a deadly or dangerous weapon.

CURTIS LOGAN TATE knowingly and voluntarily admits to all the elements of 18 U.S.C. § 111(a) and (b). Specifically, defendant admits that:

- MPD Officer G.N., USCP Sergeant A.G., and MPD Officer S.S. were assisting the United States Capitol Police on January 6, 2021.
- TATE further admits that he used a metal baton, a deadly or dangerous weapon, to forcibly assault Officer N.G. by striking Officer N.G. in the hand.
- TATE further admits that he used a metal baton, a deadly or dangerous weapon, to forcibly assault Sergeant A.G. by repeatedly striking Sergeant A.G. in the helmet.
- TATE further admits that he used a speaker box, a deadly or dangerous weapon, to forcibly assault Officer S.S. by throwing the speaker box and hitting Officer S.S. in the left arm.
- TATE further admits that he knew at that time of the assault of the above officers that the officers were engaged in the performance of their official duties or that he assaulted the officers on account of their performance of their official duties.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/ Will N. Widman
      Will N. Widman
      Trial Attorney, Detailee

## DEFENDANT'S ACKNOWLEDGMENT

I, CURTIS LOGAN TATE, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 2/28/24

_____
CURTIS LOGAN TATE
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 2/28/24

_____
Diane Shrewsbury
Attorney for Defendant