## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-cr-092-CRC** |
| **CURTIS LOGAN TATE** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Curtis Logan Tate to 78 months' incarceration, three years of supervised release, $3,176 in restitution, and the mandatory $100 special assessment for each count of conviction. The government's recommendation of 78 months of incarceration, which is also recommended by the U.S. Probation Office, is at the high-end of the applicable Sentencing Guidelines range of 63-78 months.

### I.      INTRODUCTION

The defendant, Curtis Logan Tate, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

Tate, an unemployed personal trainer from Indiana, was a one-man wrecking crew on January 6.  Tate joined the storming of the police line on the West Plaza.  There, Tate assaulted Metropolitan Police Department (MPD) Officer N.G. with a metal baton—a baton Tate had brought with him to the riot—striking Officer N.G. in the hand.  After officers at the West Plaza were overwhelmed and forced to fall back, Tate was among the first group of rioters to enter the tunnel located on the Lower West Terrace (LWT).  There, Tate stood in the threshold of the tunnel and encouraged rioters behind him to surge forward into the building.  Tate passed a riot shield that had been stolen from the police to other rioters outside of the tunnel.  Tate then posted a video on his Instagram account, which showed the inside of the tunnel with a caption reading, "FUCK ALL THESE GOVERNMENT OFFICIALS."  Tate pushed his way to the front in the tunnel and used his metal baton to assault U.S. Capitol Police (USCP) Sargeant A.G., repeatedly striking Sargeant A.G. in the head on his riot helmet.

Tate was sprayed with pepper spray by another officer, and he retreated.  Tate then returned to the tunnel entrance where he threw a black speaker box at a window on the Capitol building, causing a crack in the window to expand.  Tate assaulted MPD Officer S.S. with the same or similar black speaker box, striking Officer S.S. in the left arm.  Tate threw a shoe, which also struck Officer S.S.  Tate assisted other rioters by passing objects through a broken window, objects that were then used as improved weapons against police officers in the tunnel.  From the objects

Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

passed through the broken window, Tate threw a broken table leg and a broken floor lamp into the tunnel.  During the rioters' final attempt to breach the Capitol building at the tunnel, Tate charged the entrance brandishing a nightstick that had been taken from police officers.  Tate fought against police officers for over three hours on the West Front, taking part in some of the worst fighting of January 6—where the violence was so intense that it was later described as a "medieval battle" scene.[2]

The government recommends that the Court sentence Tate to 78 months of incarceration for his conviction of three violations of 18 U.S.C. § 111(a)(1) and (b).  A 78-month sentence reflects the gravity of Tate's conduct and the numbers of victims, but also acknowledges his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 26, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 Presidential election.

---

[2] Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Sgt. Aquilino Gonell), available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

**B.        Tate's Role in the January 6, 2021 Attack on the Capitol**

*Tate's Approach to the Capitol*

Several days prior to January 6, 2021, Tate and his then-husband ("Person-1")[3] drove from the Louisville, Kentucky area to Washington, D.C., to attend the "Stop the Steal" rally. On January 6, Tate and Person-1 arrived in the area of the Ellipse around 11:00 a.m., and they attended speeches by President Trump and others, as shown in Image 1.



*Image 1 – Tate and Person-1 near rally with Instagram tag
"TATE.LOGAN91" associated with Tate*

Following President Trump's speech, Tate and Person-1 marched with others to the U.S. Capitol.

*Tate's Assault of MPD Officer G.N. on the West Plaza*

At approximately 2:05 p.m., as shown in Exhibits A and B, Tate approached the police line

---

[3] At this time, the government does not have information that Person-1 entered the U.S. Capitol building, assaulted law enforcement, or otherwise engaged in criminal activity on January 6, 2021.

on the West Plaza wielding a metal baton.  Tate used the baton to strike MPD Officer G.N. in the

hand.  In response, another MPD officer sprayed Tate with pepper spray and Tate retreated.  After

the assault, Officer G.N. warned other officers around him that Tate was wielding a baton.



*Image 2, still from Exhibit A, timecode 00:15 – Tate assaulting Officer G.N. with a metal baton*



*Image 3, still from Exhibit B, timecode 00:54 – Tate assaulting Officer G.N. with a metal baton*

Tate did not leave the Capitol but remained near the police line on the West Plaza.

As shown in Exhibit C, Tate urged others in the crowd forward, yelling, "Keep going!"



*Image 4, still from Exhibit C, timecode 00:27 – Tate on the West Plaza yelling encouragement*

While on the West Plaza, Tate uploaded several videos (Exhibit D) to his Instagram account: "TATE.LOGAN91."  The first video showed the Capitol building and inauguration stage scaffolding with the caption: "Before the first breach."  The second video showed Tate on the West Plaza holding his metal baton.  The post included the caption: "POST 1ST MACING," referring to Tate being pepper sprayed after he had assaulted Officer N.G.  During the video, Tate yelled, "We're tearing this motherfucker down!"  The third video showed Tate with the caption: "POST 2ND TEAR GAS."  In the video, Tate displayed his metal baton and yelled, "Push forward! Our house!"



*Image 5 (left), still from Exhibit D, timecode 00:00 – Tate's video showing Capitol building*

*Image 6 (center), still from Exhibit D, timecode 00:11 – Tate's video showing himself (yellow) and metal baton (red)*

*Image 7 (right), still from Exhibit D, timecode 00:23 – Tate's video showing himself (yellow)*

**Tate's Entry to LWT Tunnel and Assault of Sargeant A.G.**

By 2:28 p.m., rioters had seized control of the West Plaza and the inauguration stage. At approximately 2:43 p.m., Tate approached the entrance to the LWT tunnel leading into the Capitol building, as shown in Exhibit E, timecode 42:20. Tate arrived at the tunnel minutes after the steps leading to the tunnel were first breached. At approximately 2:44 p.m., Tate entered the tunnel brandishing the metal baton that he had used to assault Officer N.G. over his head.



*Image 8, still from Exhibit E, timecode 42:48 – Tate (yellow) entering tunnel brandishing metal baton (red)*

At approximately 2:53 p.m., Tate stood in the threshold of the tunnel and waved other rioters behind him to enter the tunnel, as shown in Exhibit E.



*Image 9, still from Exhibit E, timecode 53:18 – Tate (yellow) waiving others to enter the tunnel*

At approximately 2:54 p.m., Tate assisted other rioters in passing a police shield out of the tunnel, which had been taken from officers protecting the Capitol, as shown in Exhibit E.



*Image 10, still from Exhibit E, timecode 53:55 – Tate (yellow) passing shield out of the tunnel*

Tate then shared fourth and fifth videos on his Instagram account, which showed the inside of the tunnel with the captions: "FUCK ALL THESE GOVERNMENT OFFICIALS" and "AND WE WILL NOT STOP," as shown in Exhibit D.  Tate is shown on Capitol CCV holding his cellphone above his head in the tunnel, consistent with using his phone to record video.



*Image 11, still from Exhibit D, timecode 00:26 – Tate's video showing the inside of the tunnel*

At approximately 2:57 p.m., Tate is shown inside the tunnel on Capitol CCV and on publicly available video (Exhibit F) brandishing the metal baton above his head and charging a line of police officers protecting the doors to the Capitol building.



*Image 12, still from Exhibit F, timecode 07:14 – Tate (yellow) brandishing metal baton (red)*

At approximately 2:58 p.m., Tate repeatedly struck USCP Sargent A.G. in the helmet with

the metal baton, as shown in Exhibit G.  In response, another USCP officer sprayed Tate with

pepper spray and Tate retreated.



*Image 13, still from Exhibit G, timecode 06:55 – TATE (yellow) attacking Sargent A.G. with*
*metal baton (red), with pepper spray (orange) and distinctive tattoo (blue)*

At approximately 2:58 p.m., Tate left the tunnel, as shown in Exhibit F.  Pepper spray

residue that was orange in color remained on Tate's face and head, as shown in Image 14.



*Image 14, still from Exhibit F, timecode 08:45 – Tate (yellow) exiting tunnel*

Tate descended the steps, experiencing the effects of pepper spray.  He decontaminated his face and eyes with water on the West Plaza, as shown in Image 15, but he did not leave the Capitol.



*Image 15 - Tate (yellow) decontaminating his eyes with water*

**Tate's Property Damage to a Capitol Building Window and Assault of Officer S.S.**

At approximately 4:12 p.m., Tate returned to the steps leading to the LWT tunnel, as shown in Image 16.  He continued to wield the metal baton that he had used to assault Officer N.G. and Sargeant A.G.

11



*Image 16 – Tate (yellow) returns to tunnel entrance with metal baton*

At approximately 4:21 p.m., Tate threw a black speaker box at an office window on the Capitol building located to the left of the LWT tunnel entrance, as shown in Exhibit H. The force of the strike caused a crack in the window to expand. The Architect of the Capitol provided the government with an invoice detailing $3,176 in costs to repair the broken window after the attack on the Capitol, for which Tate has agreed to pay restitution.



*Image 17, still from Exhibit H, timecode 00:29 – Tate (yellow) throwing speaker box (red) and breaking window*

At approximately 4:31 p.m., Tate threw the same or similar black speaker box at police officers protecting the entrance to the tunnel, as shown in Exhibit I.



*Image 18, still from Exhibit I, timecode 00:03 – TATE (yellow) throwing speaker box (red) at police officers protecting the tunnel*

Contemporaneous BWC video from MPD Officer S.S. (Exhibit J), showed the speaker box thrown by Tate strike Officer S.S. in the left arm, causing Officer S.S. to let go of his nightstick. As shown in Exhibit J, Tate threw a shoe at the tunnel, which also struck Officer S.S.



*Image 19, still from Exhibit J, timecode 01:19 – Speaker box (red) thrown by Tate hitting Officer S.S. in the left arm*

Photographs taken by Sargeant A.G. showed objects that had been thrown at police officers in the tunnel, even after rioters had been cleared from that area. A black speaker box of the same approximate size, shape, and appearance thrown by Tate at Officer S.S. is shown below in Image 20.



*Image 20 – Speaker box (red) in tunnel*

Less than 30 seconds after the above assaults by Tate on Officer S.S., a mob of rioters violently charged the entrance to the tunnel and pushed against Officer S.S. and other officers who were protecting the Capitol, as shown in Exhibit J, timecode 01:40.

### *Additional Assaults and Threatening Acts by Tate at the LWT Tunnel*

Minutes later, Tate assisted other rioters by passing stolen objects through the same office window described above, which had now been completely breached.  As shown in Exhibit I, Tate received a table leg with a protruding nail that appears to have been broken office furniture.  A floor lamp was also passed through the broken window, as shown in Image 21.  These objects were later used by Tate and others as improvised weapons against police officers in the tunnel.



*Image 21, still from Exhibit I, timecode 00:47 – Tate (yellow) holding broken table leg (red), and floor lamp (blue) passed outside*

14

Holding the broken table leg with a protruding nail, Tate navigated his way through the crowd towards the tunnel entrance. At approximately 4:34 p.m., Tate threw the table leg at police officers in the tunnel, as shown in Exhibit K.



*Image 22, still from Exhibit K, timecode 07:08 – Tate (yellow) throwing broken table leg (red) at police officers*

As shown in Image 23, contemporaneous Capitol CCV shows the table leg thrown by Tate entering the tunnel. At that point, the CCV camera lens was blurred by unknown liquids. It is unclear which, if any, police officers were struck by the table leg.



*Image 23, still from Exhibit E, timecode 02:33:45 – Broken table leg (red) thrown by Tate entering tunnel*

Later that day, Sargeant A.G. photographed a broken table leg with a protruding nail in the tunnel, which had the same approximate size, shape, and appearance of the table leg thrown by Tate, as shown below in Image 24.



*Image 24 – Broken table leg with protruding nail (red) in tunnel*

At approximately 4:38 p.m., Tate, together with others, carried a long piece of lumber towards the entrance to the tunnel, as shown in Image 25.



*Image 25 – Tate (yellow) carrying a piece of lumber towards the tunnel*

At approximately 5:01 p.m., Tate threw a floor lamp at police officers who were protecting the entrance to the tunnel, as shown in Exhibit L.  It is unclear which, if any, police officers were struck by the floor lamp.

16



*Image 26, still from Exhibit L, timecode 00:29 – Tate (yellow) throwing floor lamp (red)
at police officers*

At approximately 5:05 p.m., Tate and other rioters made a final attempt to breach the LWT

tunnel entrance to the Capitol building.  On this occasion, Tate brandished a police officer's stolen

nightstick in a threatening manner, as shown in Image 27.



*Image 27 – TATE (yellow) brandishing nightstick (red) at police officers*

During the above attempt to breach the tunnel, law enforcement deployed tear gas on the

LWT and on Capitol grounds.  At that time, Tate was still located on the LWT near the tunnel,

as shown in Image 28.



*Image 28 – Tate (yellow) at LWT while officers deployed tear gas*

Following the deployment of tear gas on the LWT, Tate retreated from the U.S. Capitol—roughly three hours after his first assault on Officer G.N. on the West Plaza.

### *Officer Victims*

### i.   MPD Officer G.N.[4]

Officer G.N. was interviewed by the FBI in connection with the above-described assault. Officer G.N. recalled the incident and identified the individual who was responsible for assaulting him as Tate.  Officer G.N. advised that he was hit in the arm with a metal baton, and that the blow moved his glove in such a way that the bare skin beneath it was partially exposed.  Officer G.N.'s skin on that portion of his hand was later affected by pepper spray deployed by others.

### ii.   USCP Sergeant A.G.[5]

Sargent A.G. was interviewed by the FBI in connection with the above-described assault. Sergeant A.G. recalled Tate assaulting him by striking him with a metal baton.  Sargeant A.G. recalled Tate standing two to three people in front of him in the tunnel.  Sargent A.G. observed

---

[4] A victim impact statement from Officer G.N. is attached as Exhibit M.
[5] A victim impact statement from Sargeant A.G. is attached as Exhibit N.

18

Tate reach over other rioters while brandishing a metal baton and repeatedly strike him in the head, on his riot helmet, with the baton.  Sargent A.G. did not remember the exact number of strikes, but he did recall feeling pain as result of the strikes.  One of Tate's strikes caused Sargent A.G.'s clear face shield on his riot helmet to snap up, exposing his face.  Sargent A.G. believed that he could have been killed by the strikes dealt by Tate if Sargeant A.G. had not been wearing a metal riot helmet during the assault.

Sargeant A.G. provided photographs of his riot helmet that he took after January 6, which showed indentations on Sargeant A.G.'s helmet.  Sargeant A.G. advised that he could not be certain whether the indentations on his helmet were caused by Tate's assault.  According to Sargeant A.G., the markings could have been from Tate or from another known subject who also struck Sargeant A.G. in the head on his riot helmet:[6]



*Images 29 (left) and 30 (right) – Indentations on Sargeant A.G.'s riot helmet*

---

[6] Sargeant A.G. no longer possesses the riot helmet.  The helmet was returned to USCP in 2022, as the equipment was deemed expired.

Sargeant A.G. told agents that his experience on January 6 caused him to suffer Post Traumatic Stress Disorder (PTSD) and led him to retire from USCP.

### iii.    MPD Officer S.S.

Officer S.S. was interviewed by the FBI in connection with the above-described assault. Officer S.S. recalled the incident where he was struck with the speaker box thrown by Tate. Officer S.S. recounted that the speaker box hit him in the head and, he believes, led to a concussion. At sentencing, the government has only been able to locate video of the speaker box striking Officer S.S.'s left arm.  In addition to Tate's assault, Officer S.S. reportedly suffered as many as 15 other assaults including thrown items striking him, strikes with fists, and strikes with a baseball bat, a medical crutch, and police shields.  Other objects, including a larger black speaker box— shown above in Image 24—were also thrown into the tunnel at police officers like Officer S.S. In the days following January 6, Officer S.S. reported experiencing pain to his neck, right forearm, and hands as result of the repeated assaults by rioters in the tunnel.

### *Tate's Pre-Arrest Statements to the FBI and USA Today Article*

On January 13, 2021, Tate was interviewed by the FBI at his residence in Clarksville, Indiana.  Tate admitted that he had been at the U.S. Capitol in Washington, D.C. on January 6, 2021.  Tate admitted to using his cellphone on January 6 and that he captured at least one image and one video of the attack on the Capitol.  Tate admitted that he posted several videos to his Instagram account and that he deleted some of his posts afterwards.  Tate admitted to wearing a tactical-style vest and bringing a metal baton with him to the Capitol.

Tate informed agents that he and Person-1 drove to Washington, D.C., a few days prior to January 6.  He and Person-1 arrived at the Ellipse area around 11:00 a.m. and heard speeches by

President Trump and others.  Tate stated that he and Person-1 then marched with others to the Capitol.

During the interview, Tate continually expressed disapproval of the violence that occurred at the Capitol on January 6.  He stated that he never entered the Capitol building.  Tate mentioned that he observed a broken window near the entry to the building, but he falsely claimed that he did not see anyone go inside the Capitol and he did not admit to breaking the window.  Tate stated that he and Person-1 returned to their hotel room at approximately 6:00 p.m., and they returned to Indiana on the following day.

Agents admonished Tate that lying to a federal agent was a crime.  Tate repeated that he did not enter the Capitol building and falsely stated that he did not commit any acts of violence or vandalism on January 6.  Tate told investigators there was "nothing that would compel [him] to do something like vandalize a building, hurt anybody, or try to break in a building."  Tate stated that he did not "agree with them destroying shit, breaking shit, [or] destroying our historic house."  Tate claimed that he did not regret going to the Capitol on January 6 and again denied engaging in any illegal conduct.

On March 2, 2023, USA Today newspaper published a story about January 6 rioters who had been identified but not yet arrested, wherein Tate agreed to be interviewed.[7]  In the article, Tate admitted that he was the individual pictured in FBI photograph "Suspect #119 – AFO" (Image 31).  Tate admitted that he was at the Capitol on January 6 but lied repeatedly about

---

[7] *See* Carless, Will, *After Jan. 6 riot, hundreds of identifiable people remain free. FBI arrests could take years,*" USA Today, March 2, 2023, *available at* https://www.usatoday.com/story/news/nation/2023/03/02/sedition-hunters-hundreds-jan-6-rioters-pending-fbi-arrests/11283885002/, last visited June 7, 2024.

assaulting police officers.  Tate was quoted: "I would never hurt an officer.  I come from a military background.[8]  I'm very respectful of our military and police…  I know I didn't hurt anybody… I'm not speaking here bold as brass, because you never know what can happen… but I've never, ever once hurt, or put my hands on an officer…  I never did it.  So, I'm not going to live the rest of my life in fear."



*Image 31 – Tate in FBI photograph "Suspect #119 – AFO" published in USA Today*

### Tate's Post-Arrest Statements in Jail Calls and Gateway Pundit Article

On August 24, 2023, Tate was arrested in Wilmington, North Carolina, and ordered detained pretrial due to the violent nature of his crimes.  Tate's custody was transferred from New Hanover, North Carolina to the District of Columbia Department of Corrections (DC-DOC). On at least seven occasions between October and December 2023, Tate participated in jail calls from DC-DOC to demonstrators at "Freedom Corner,"[9] a group that regularly gathers outside of

---

[8] The government does not have information that Tate or his parents ever served in the military.

[9] *See* Stein, Chris, *'They fought for freedom': the nightly vigil to sanctify the January 6 rioters*, The Guardian, June 3, 2023, *available at* https://www.theguardian.com/us-news/2023/jun/03/washington-dc-vigil-january-6-capitol-trump, last visited June 3, 2024.

DC-DOC to protest the prosecution of January 6 defendants.  Livestreams of Freedom Corner demonstrations featuring Tate were publicly broadcast on YouTube.[10]

In these jail calls, Tate portrayed himself as a victim of injustice rather than a perpetrator of violence on January 6.  Tate expressed pride in his actions and that he believed he had done nothing wrong:

- "The last thing I want to do is to make it seem like any of the bureaucrats or prosecutors are gonna wear me down…  I understand I'm here for the long haul and however long that takes, you know.  I'm more than equipped to ride out the storm…  Hell yeah.  Chest out.  Let's go!  Yeah, homie ain't never been scared." (Oct. 29, 2023)

- Tate stated he had received discovery in his criminal case and remarked that he wanted to share videos that he recorded on January 6 with the public. A demonstrator hosting the broadcast responded, "The American public needs to know what the government did that day."  Tate agreed, "Yeah, absolutely, every bit of it.  That will be my focus while I'm going through this process."  (Nov. 9, 2023)

- "It's going to take your everyday citizen to stand up and use their voice.  You know January 6'ers did that, you know, when we went to the Cap—, you know, when we went to the rally.  We went there to peacefully protest, peacefully demonstrate." (Dec. 18, 2023)

- "I don't want to lose my life in a jail cell, and I don't believe I'm going to."  Tate continued, "Even my poor mom, I love her to death, she's like, 'You know,

---

[10]     *See* October 18, 2023 Broadcast, *available at* https://www.youtube.com/watch?app=desktop&v=sLbw67brMHs, last visited June 3, 2024; October 29, 2023 Broadcast, *available at* https://www.youtube.com/watch?app=desktop&v=h4FrnCA_LAA, last visited June 4, 2023; October 31, 2023 Broadcast, available at https://www.youtube.com/watch?app=desktop&v=yLVdr9vef60, last visited June 3, 2024; November 9, 2023 Broadcast, *available at* https://www.youtube.com/watch?v=cq2i_8KAnKQ, last visited June 4, 2024; November 23, 2023 Broadcast, *available at* https://www.youtube.com/watch?app=desktop&v=78qEdpEq0KY, last visited June 3, 2024; December 8, 2023 Broadcast, *available at* https://www.youtube.com/watch?app=desktop&v=lAMzbMhE9yM, last visited June 3, 2024; December 18, 2023 Broadcast, *available at* https://x.com/realconaldrump/status/1736917128618315783?s=46, last visited June 6, 2024.

hopefully you see that, you know, you'll learn your lesson.'  And I'm like, it's like no, it's not about that!  I'm like, it's not about learning my lesson…  I'll never sit here and say that!"  One of the demonstrators hosting the broadcast asked, "Did you learn your lesson not to reach out to the FBI and the federal government again?"  Tate replied, "Yeah, yeah, exactly…  I'll do better next time…  Time will tell."  (Dec. 18, 2023)

On several occasions, Tate described his experience on January 6 and subsequent arrest:

- Tate admitted that he was "in the tunnel" and wanted to "get through the doors to go in and see what was going on" inside the Capitol building. (Oct. 18, 2023)

- Tate described his interview with investigators on January 13, 2021, and made false claims about his vehicle being searched without a warrant.  (Oct. 31, 2023)

Tate expressed support for other January 6 defendants and described himself as a brother-in-arms with other January 6 detainees at DC-DOC:

- Tate stated that since he had been in pretrial detention, he wanted to "get linked up with the patriots" at DC-DOC.  (Oct. 18, 2023)

- "I love the support…  I'm glad to be a part of you guys…  I'm glad to be around the men that I am."  (Oct. 18, 2023)

- Tate stated that he "hoped to run into" other January 6 defendants from the Louisville area while incarcerated.  (Oct. 29, 2023)

- Tate said that he was "starting to consider [other January 6 detainees at DC-DOC to be] really good friends."  (Oct. 29, 2023)

- "I just saw on the news, there's a massive manhunt for a dangerous, dangerous J6'er…  House was surrounded in New Jersey, and he still managed to walk out the front door.  Funny how that happens.  And then another guy in Indiana that they're looking for.  So, prayers be with them."  (Nov. 9, 2023)

- "I'm very fortunate to be with the group of guys that I'm with," referring to other January 6 detainees.  (Nov. 23, 2023)

In several jail calls, Tate discussed the progress of his criminal case, including conversations with his attorney regarding plea negotiations.  In almost every broadcast, Tate

24

provided his booking number for viewers to donate to his commissary account and directed viewers to donate to his Give Send Go fundraising account.[11]

On February 22, 2024—two days after the parties reached a plea agreement and a criminal information was filed in this case—an article about Tate was published on the Gateway Pundit website.[12]  The article included a byline from Jim Hoft, founder of Gateway Pundit, but the narrative was written in first person from the defendant's perspective.  In this article, Tate admitted that his purpose on January 6 was to stop the certification of the 2020 Presidential Election, he falsely blamed police officers for initiating violence on January 6, and he completely omitted his multiple violent assaults on police officers and property damage.  Instead, Tate branded himself as a victim of injustice and called other January 6 detainees in DC-DOC "some of the best guys."  Tate mischaracterized the terms of his plea agreement, including that he was being prosecuted for protesting.  Multiple hyperlinks to Tate's online fundraiser were included in the article with the phrase: "Please donate to Curtis Tate's Give Send Go account here."  Sure enough, in the days following the above article's publication, donors sent thousands of dollars to Tate through his Give Send Go account.  To date, Tate has fundraised $10,722 through that website.[13]

### III.    THE CHARGES AND PLEA AGREEMENT

On February 20, 2024, Tate was charged by Information with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, under 18 U.S.C. §§ 111(a)(1) and (b)

---

[11] *Available at* https://www.givesendgo.com/curtistate, last visited July 1, 2024.
[12] *See* Hoft, Jim, *He Overcame Drug Addiction and Homelessness – He Attempted to Save Rosanne Boyland on Jan. 6 from Death – Now the Biden Regime Wants Him to Spend Over 10 Years in Prison – Please help Curtis Tate in His Time of Need*, Gateway Pundit, February 22, 2024, a*vailable at* https://www.thegatewaypundit.com/2024/02/he-overcame-drug-addiction-homelessness-he-attempted-save/, last visited June 7, 2024.
[13] *See* fn. 11 *infra*.

(Count One – Assault of Office G.N.); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, under 18 U.S.C. §§ 111(a)(1) and (b) (Count Two – Assault of Sargeant A.G.); and Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, under 18 U.S.C. §§ 111(a)(1) and (b) (Count Three – Assault of Officer S.S.). ECF No 23.

On, March 7, 2024, Tate plead guilty to Counts One, Two, and Three of the Information.

## IV.   STATUTORY PENALTIES

Tate now faces sentencing on three counts of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, under 18 U.S.C. §§ 111(a)(1) and (b).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 for each count of conviction.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Tate's adjusted offense level under the Sentencing Guidelines as follows:

Count One: 18 U.S.C. § 111(a)(1) and (b)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Use of Dangerous Weapon | +4 |

26

| U.S.S.G. § 2A2.2(b)(7) | Convicted Under § 111(b) | | +2 |
| U.S.S.G. § 3A1.2 | Official Victim | | +6 |
| | | Total | 26 |

Count Two: 18 U.S.C. § 111(a)(1) and (b)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Use of Dangerous Weapon | | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Convicted Under § 111(b) | | +2 |
| U.S.S.G. § 3A1.2 | Official Victim | | +6 |
| | | Total | 26 |

Count Three: 18 U.S.C. § 111(a)(1) and (b)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Use of Dangerous Weapon | | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Convicted Under § 111(b) | | +2 |
| U.S.S.G. § 3A1.2 | Official Victim | | +6 |
| | | Total | 26 |

Grouping

| U.S.S.G. § 3D1.1(a)(1) | Group 1 is Count 1 (18 U.S.C. § 111). | | |
| | Group 2 is Count 2 (18 U.S.C. § 111). | | |
| | Group 3 is Count 3 (18 U.S.C. § 111). | | |
| U.S.S.G. § 3D1.1(a)(2) | Highest offense level: | | 26 |
| U.S.S.G. § 3D1.1(a)(3) | 3 units, increase of three. | | +3 |
| | | **Total** | **29** |

| **Combined Offense Level** | | **29** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | <u>-3</u> |
| **Total Adjusted Offense Level:** | | **26** |

*See* PSR at ¶¶ 45-78.[14]

---

[14] Per the terms of the parties' plea agreement, sentencing enhancement points for bodily injury were not applied to any of the above assaults since it is unclear whether any of Tate's assaults resulted in bodily injury.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed.  PSR ¶ 84.  Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 26, Tate's Guidelines imprisonment range is 63 to 78 months' imprisonment.  The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Tate's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.  Tate was seriously violent against law enforcement on January 6.  He assaulted Officer N.G. by striking him in the arm with a metal baton, a weapon that Tate had brought with him that day.  Tate was pepper sprayed and he temporarily retreated, but he was not deterred and continued to press forward.  Tate charged towards the Capitol building, into the LWT tunnel—the location where fighting was most severe and extreme on January 6—waiving the metal baton over his head and motioning to others behind him to follow.  In the tunnel, Tate charged the police line again and used his baton to viciously strike Sargeant A.G. in the head on his riot helmet.  Again, Tate was pepper sprayed and he temporarily retreated, but he was still not deterred.  When Tate returned to the area of the LWT tunnel entrance, he went on a rampage.  Tate used a speaker box to smash a window on the Capitol building.  He then used the same or

similar speaker box to assault Officer S.S., hitting the officer in the left arm.  He used other found or stolen objects like a shoe, lumber, a table leg, and a floor lamp—anything he could get his hands on—as weapons against police officers protecting the Capitol building.  In a final push against officers in the tunnel, Tate charged the police line on a third occasion, brandishing a stolen police nightstick above his head.  The nature and circumstances of Tate's offenses were of the utmost seriousness, and fully support the government and U.S. Probation's recommended sentence of 78 months' incarceration.

**B.  The History and Characteristics of the Defendant**

Tate previously worked as a machine operator, a nursing assistant, a personal trainer, a welder, and an insurance agent.  PSR at ¶¶ 126-130.  However, Tate was unemployed on January 6, 2021, and he was unemployed when he was arrested in August 2023.  PSR at ¶¶ 125 and 128.

At the time of his arrest, Tate resided at a drug rehabilitation center in Wilmington, North Carolina.  PSR at ¶ 105.  The defendant does not have a fixed address at the time of sentencing.  *Id.*

Tate has self-reported a history of alcohol and drug abuse.  Tate began drinking alcohol at age 11 and his consumption of alcohol began to increase around age 25.  PSR at ¶ 116.  Tate reported using a variety of illegal drugs, including marijuana, cocaine, heroin, methamphetamines, oxycodone, and Adderall.  PSR at ¶ 117.  By age 30, Tate reported that his cocaine use cost between $200 and $250 a week to support his habit.  *Id.*  Tate reported last using illicit substances in February 2023.  *Id.*

Tate has a significant and history of arrest and conviction which weigh in favor of a lengthy period of incarceration:

- In January 2012, the defendant (age 20) was charged with and pleaded guilty to operating a vehicle without a license in New Albany, Indiana. He was sentenced to 16 days incarceration. PSR at ¶ 80.

- In May 2012, the defendant (age 21) was charged with criminal damage to property and disorderly intoxication in Palm Beach County, Florida. In that case, Tate was intoxicated and urinated on the hallway floor of a hotel. Tate told officers who responded that he was in Florida for alcohol rehabilitation. These charges were ultimately dismissed *nolle prosequi* in October 2017. PSR at ¶ 87.

- In February 2013, the defendant (age 21) was charged with first degree possession of a controlled substance (oxycodone) and drinking alcohol in public in Louisville, Kentucky. The disposition of these charges remains unknown. PSR at ¶ 88.

- In February 2018, the defendant (age 26) was charged with speeding over 19 miles per hour (MPH) over the speed limit, reckless driving, and expired registration. In that case, Tate operated his vehicle at 74 MPH in a 55 MPH limited access zone with expired tags. Tate pleaded guilty to speeding and was sentenced to seven days incarceration with credit for two days' time served. PSR at ¶ 85.

- In August 2018, the defendant (age 27) was charged with and pleaded guilty to reckless driving and public intoxication in Georgetown, Indiana. In that case, Tate was suspected of operating a vehicle while under the influence of alcohol. Tate lied to officers during the traffic stop about consuming alcohol prior to driving, and he refused all field sobriety tests and a breathalyzer. By the time the defendant submitted to a chemical test in jail, his blood alcohol content (BAC) was below the legal limit. The defendant was sentenced to 180 days home incarceration with 120 days suspended, and alcohol monitoring. PSR at ¶ 82.

- In September 2018, the defendant (age 27) was charged with and pleaded guilty to operating a vehicle under the influence of drugs or alcohol in Jefferson, Kentucky. In that case, Tate was arrested for driving while intoxicated again. The defendant initially refused but ultimately submitted to and failed field sobriety tests. The defendant's BAC was 0.207 at the time of arrest. Officers noted that the defendant was very argumentative during interactions. Tate was sentenced to 30 days incarceration with credit for two days' time served, which was suspended for two years under unsupervised probation. Additionally, Tate's sentence included a period of eight days' home incarceration. PSR at ¶ 83.

- In August 2020, the defendant (age 29) was charged with driving with a suspended license, possession of marijuana, and distribution of marijuana in Clark, Indiana. In that case, officers conducted a search of Tate's vehicle and seized 173 grams of marijuana divided into seven Ziploc bags. Officers also seized eleven THC vaporizer pens, $605 in currency, empty Ziploc bags, and two glass vials containing

30

an unspecified clear liquid.  Officers noted that Tate was hostile towards law enforcement during interactions, calling names and belittling the investigating officers.  These charges remain pending at the time of sentencing in the instant case. PSR at ¶ 90.

- In July 2021, the defendant (age 30) was charged with driving with a suspended license and leaving the scene of an accident in Clark, Indiana.  In that case, another vehicle struck Tate's vehicle and Tate drove away from the accident before police officers arrived at the scene.  These charges remain pending at the time of sentencing in the instant case.  PSR at ¶ 91.

The defendant's crimes on January 6 were not an isolated event in an otherwise law-abiding life.  They came, instead, after a series of offenses spanning almost 10 years, which included several arrests wherein Tate endangered the public while intoxicated and showed hostility towards law enforcement.  The defendant's criminal history demonstrates a propensity towards criminal activity that is concerning.  The defendant's history and characteristics, including his prior arrests and convictions, sentences of incarceration and home incarceration, recidivism after periods of probation and alcohol monitoring, multiple failures to appear, yearslong use of illegal drugs, pending criminal charges in Indiana for drug distribution, repeated endangerment of the public when driving while intoxicated, and hostility towards law enforcement, weigh heavily in favor of a lengthy term of incarceration.  This is especially so when considering that despite his prior arrests, his criminal history category does appear to undercut the severity of his involvement with the criminal justice system.

## C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.  Tate's criminal conduct on January 6 was the epitome of disrespect for the law.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was

simply a political protest, simply an episode of trespassing in a federal building.  What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.      The Need for the Sentence to Afford Adequate Deterrence

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[15]  The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Tate has a criminal history category of I, his history of arrest and conviction, as well as his alleged drug distribution and yearslong use of illegal drugs, show a clear pattern of unlawful conduct.  *See* Section VI(B) *supra.*  Second, although the defendant has now pleaded guilty to assaulting three police officers and acknowledges the veracity of his conduct as described in the Statement of Offense,[16] his statements after January 6 to the FBI, journalists with USA Today and Gateway Pundit, and demonstrators at Freedom Corner, were those of a man without remorse.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30

---

[15] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

[16] On advice of counsel, the defendant did not make any additional statements regarding acceptance of responsibility during his presentence interview with U.S. Probation.  PSR at ¶ 44.

("[The defendant's] remorse didn't come when he left that Capitol.  It didn't come when he went home.  It came when he realized he was in trouble.  It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.  It came when he realized that he could go to jail for what he did.  And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).  Less than a week after January 6, Tate repeatedly lied to investigators and told them that he did not regret his actions that day.   Tate's own post-arrest statements demonstrate that he is unconcerned with criminal prosecution for his actions on January 6, claiming that he was "more than equipped to ride out the storm," that he "ain't never been scared," and that his incarceration was "not about learning [his] lesson."   This defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his violent assaults and rhetoric.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."  *Rita v. United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).  Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added).  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).  After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have

34

sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[17]

Although all the other defendants discussed below participated in the Capitol riot on January 6, 2021, many salient differences explain the differing recommendations and sentences.[18] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Recently, in *United Staes v. Dale Huttle*, 22-cr-00403 (CRC), the Court sentenced defendant Huttle for assaulting a police officer on January 6. In that case, Huttle used a flagpole to jab an MPD officer, causing that officer to fall backwards and suffer a slipped disc in his back. Prior to the assault, Huttle told others, "I think we ought to bum rush the Capitol building!" Similarly, Tate posted videos on his Instagram account wherein he yelled, "We're tearing this motherfucker down," referring to the U.S. Capitol, and encouraged other rioters, "Push forward! Our house!" Tate and Huttle both assaulted officers on the West Plaza near the barricade line. Huttle used a flagpole, as detailed above; Tate used a metal baton to strike Officer N.G. Tate and

---

[17] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[18] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Huttle were both undeterred by law enforcement's use of less than lethal means of deterrence on the West Plaza, including pepper spray. Tate was part of the first group of rioters to enter the LWT tunnel, where he charged the police line and assaulted Sargeant A.G. with his metal baton by striking the officer in the head. Around that time, Huttle was located on the West Plaza after the police line fell, where he continued to attack police by grabbing an officer's gas mask and baton. While Huttle's activity ended there, Tate continued to assault police officers in the tunnel for over an hour, including by throwing a speaker box at Officer S.S. Huttle's assault resulted in serious bodily injury; none of Tate's assaults resulted in bodily injury. After January 6, Huttle did not express remorse for his crimes following his arrest, calling himself the "ultimate patriot," and stating, "I have no regrets. I will not say I'm sorry." As detailed above, Tate repeatedly denied and downplayed the seriousness of his crimes and considered himself a victim injustice rather than a perpetrator of violence. Huttle plead guilty to one count of assault with a dangerous weapon in violation of 18 U.S.C. § 111(a)(1) and (b). The Court sentenced Huttle to 30 months' incarceration followed by three years of supervised release. Here, Tate has been convicted of not one but three counts of violations of 18 U.S.C. § 111(a)(1) and (b)—one count for each officer victim whom the government was able to identify. The Court should appropriately consider Tate's other conduct on January 6 and afterwards when fashioning a just sentence, including additional assaults with a shoe, a broken table leg, and a floor lamp, verbal and physical encouragement to other rioters, charging the police line after being pushed back on multiple occasions at different locations, and repeated denials and false public statements after the fact. Notably, Huttle's advanced age and health were factors at sentencing. Additionally, Huttle was on pretrial release at the time of sentencing. In this case, Tate is a healthy 33-year-old man, who has been in pretrial detention for

approximately 10 months.  While Tate's sentence of 78 months would be greater than that of the 30 months' sentence that the Court imposed in *Huttle*, Tate's conduct was demonstrably worse and merits a lengthier term of imprisonment.

In *United States v. James McGrew*, 21-cr-00398 (BAH), the defendant McGrew attended the rally before marching to the U.S. Capitol with others like Tate.  McGrew brought a dangerous weapon—bear mace—with him to Washington, D.C.; Tate brought a metal baton.  Just like Tate, McGrew first joined the storming of the police line at the West Plaza, where he worked his way to the front of the crowd until he was face-to-face with officers.  Unlike McGrew, however, Tate assaulted a police officer on the West Plaza with his metal baton.  McGrew and Tate were both pepper sprayed on the West Plaza by officers protecting the Capitol, both retreated, and both returned to continue fighting.  Unlike Tate, McGrew entered the Capitol through the Upper West Terrace doorway.  Prior to entering, McGrew—like Tate—encouraged other rioters to push forward, repeatedly yelling, "Let's go!" and "Come on! come on!"  Within seconds of entering the Capitol, McGrew struck an MPD officer with his left hand and continued further into the building.  Around that same time on January 6, Tate had entered the LWT tunnel, where he assaulted Sargeant A.G. with a metal baton.  Inside the building, McGrew screamed at law enforcement officers and refused to follow instructions to leave.  McGrew also struck several more officers, attempted to and successfully grabbed officers' batons, and locked arms with other rioters, in defiance of officers' commands that rioters leave the building.  McGrew was ultimately forced out of the Capitol building, but—just like Tate—he did not leave after being forced back multiple times.  McGrew made his way to the LWT tunnel.  There, both McGrew and Tate used found objects to assault police officers.  McGrew threw a wooden handrail, which hit an officer in the

riot helmet.  Tate threw multiple objects, including a black speaker box that struck Officer S.S., as well as a shoe, a broken table leg, and a floor lamp.  McGrew plead guilty to one count of 18 U.S.C.§ 111(a)(1) and his guidelines calculation included an enhancement under U.S.S.G. § 3A1.2(c)(1) for assaulting a law enforcement officer in a manner creating a substantial risk of serious bodily injury, which is not included in Tate's guidelines analysis.  At sentencing, then-Chief Judge Howell was troubled that U.S. Probation had found McGrew was unable to afford the cost of a fine, while the government had information that McGrew had raised over $40,000 through the fundraising website GiveSendGo, just like in Tate's case.  *See id.*, ECF No. 114, Sentencing Tr. at 21-23, 51-53.  In light of the defendant's fundraising, Judge Howell imposed a $5,000 fine in addition to restitution.  *Id.* at 84.  Judge Howell also questioned the two-point reduction for acceptance of responsibility under U.S.S.G. § 3C1.1, due to the defendant McGrew's repeated denials of his criminal conduct on podcasts immediately before his guilty plea and in the months thereafter.  *Id.* at 11-29.  Ultimately, however, Judge Howell subtracted two points for acceptance of responsibility in light of the defendant's guilty plea, but the Court considered McGrew's public statements in assessing an appropriate sentence within a guidelines range of 70-87 months.  *Id.* at 28-30.  This Court should likewise consider Tate's public statements when fashioning a just sentence.  Judge Howell sentenced McGrew to 78 months' incarceration followed by three years supervised release, which is the same sentence the government is seeking for Tate.  *Id.* at 88.

Also consider *United States v. Josiah Kenyon*, 22-cr-00726 (CJN).  In that case, the defendant Kenyon, an unemployed 35-year-old man, travelled by car to Washington, D.C. from Reno, Nevada with his wife and young children.  On January 6, 2021, Kenyon used his fist and a flagpole to damage a large exterior window.  Likewise, Tate used a black speaker box to break a

window near the LWT tunnel, which was ultimately breached and became an entry point for the

rioters. Like Tate, Kenyon joined and participated in assaulting police officers with a large and

violent group of rioters at the LWT tunnel. There, Kenyon used several large objects, including a

rubber pylon, to violently assault officers attempting to the guard the tunnel area. At one point,

Kenyon used a broken table leg with a protruding nail to strike an officer in the leg and then to

strike a second officer on the head such that Kenyon's weapon became lodged in the officer's face

shield and riot helmet. Tate threw a similar broken table leg with a protruding nail into the tunnel

at police officers. Unlike Tate, Kenyon joined other rioters who breached the Capitol and spent

approximately 30 minutes walking through the building. Even though he did not get in, Tate's

post-arrest statements revealed his intention on January 6 was to "get through the doors to go in

and see what was going on" inside the Capitol building. And, while Tate did not enter the Capitol

building, he remained outside fighting police officers until the LWT was cleared. Kenyon pleaded

guilty to one count of 18 U.S.C. § 111(a)(1) and (b), and he was sentenced by Judge Nichols to 72

months' incarceration followed by two years' supervised release. Kenyon received an

enhancement for bodily injury under U.S.S.G. § 2A2.2(b)(3)(A); none of Tate's assaults resulted

in bodily injury to his victims. Nonetheless, Tate has pleaded guilty to three counts of

18 U.S.C. § 111(a)(1) and (b)—not just a single count, as in Kenyon's case—which militates a

higher sentence of 78 months' incarceration.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579,

96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[19]  Generally, restitution under the VWPA must "be tied to the loss

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b).  At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3).  *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.  The victims in this case,

Officer N.G., Sargeant A.G., and Officer S.S., did not suffer bodily injury as a result of Tate's

assaults.  None of the victims have requested restitution.  The parties agreed, as permitted under

18 U.S.C. § 3663(a)(3), that Tate must pay $3,176 in restitution, which reflects in part the role

Tate played in damaging a window on the Capitol building on January 6.[20]  ECF No. 25, Plea

Agreement at ¶ 11.  As the plea agreement reflects, the riot at the United States Capitol had caused

"approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the

Architect of the Capitol and other governmental agencies as of July 2023.  *Id.*  (As noted above in

footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP,

---

[19] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[20] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

and MPD.)  Tate's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.  *Id*.

## VIII.   FINE

The defendant's convictions under 18 U.S.C. Section 111 subject him to a statutory maximum fine of $250,000.  *See* 18 U.S.C. § 3571(b)(3).  In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.  *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).

The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.  U.S.S.G. § 5E1.2(a), (e) (2023).  The burden is on the defendant to show present and prospective inability to pay a fine.  *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).  "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'"  *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine.  § 5E1.2(a), (e).  With an offense level of 26, the guidelines fine range here is $25,000 to $250,000 U.S.S.G. § 5E1.2(c).

A fine is appropriate in this case, as it was in *McGrew*, 21-cr-00398 (BAH).  The PSR notes—and looking most recently at his Give Send Go page[21]—that the defendant has received

---

[21] Tate's Give Send Go profile states that he has fundraised $10,722.  *See* fn. 11 *infra*.

41

over $10,000 in an online fundraising campaign.   PSR ¶ 136.   The request for donations,

purportedly written by the defendant, refers to the defendant as "the J6 [] family's favorite southern

boy."  The defendant asks for funds to "help support me while I'm incarcerated, to manage bills I

still have on the outside and to hopefully set me on a good foundation for when I leave this place

behind."  The defendant is represented by an able public defender and has no legal fees associated

with his case.  He should not be able to use his own notoriety gained in the commission of his

crimes to "capitalize" on his participation in the Capitol riot in this way.[22]

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

sentence of 78 months' incarceration, three years of supervised release, $3,176 in restitution, and

the mandatory $100 special assessment for each count of conviction.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:     *s/ Will N. Widman*
WILL N. WIDMAN
NC Bar No. 48158
Trial Attorney, Detailee
United States Attorney's Office
601 D Street, NW
Washington, D.C. 20530
(202) 353-8611
Will.Widman@usdoj.gov

---

[22] Notably, the majority of donations to the defendant's Give Send Go account coincide with the date of the publication of Tate's article in Gateway Pundit, which provided a hyperlink to the fundraising website, as further detailed above.