**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 24-cr-92 (CRC)** |
| | ) | |
| **CURTIS LOGAN TATE** | ) | |
| | ) | |

## MEMORANDUM IN AID OF SENTENCING

Curtis Logan Tate will be before the Court for sentencing on July 9, 2024, having accepted full responsibility for his conduct at the U.S. Capitol on January 6, 2021. Mr. Tate has admitted that he assaulted officers and damaged a window on that terrible day. Since the events of January 6, Mr. Tate has worked hard to fight his drug addiction, focus on his mental health, and put himself in the best position possible to blaze a positive path forward. Mr. Tate is, at his core, a gentle, kind person who lost his way and behaved inconsistently with his character on January 6. As the countless letters submitted on his behalf clearly demonstrate, the conduct for which he was convicted is completely outside of his character. He has changed the trajectory of his life since that day and, even while incarcerated at the D.C. Jail, he has continued to focus on that new, positive trajectory, not allowing himself to be pulled off track. Mr. Tate has reflected on his conduct and has expressed his contrition repeatedly to his friends and family, as made evident by their letters. Mr. Tate accepts his punishment for what he did that day. Application of the sentencing factors demonstrate that a sentence of no more than 36 months is sufficient but not greater than necessary to achieve the goals of sentencing.

## I.   PROCEDURAL HISTORY

Mr. Tate was arrested on a Criminal Complaint from The Healing Place in North Carolina, where he was undergoing inpatient drug treatment, on August 24, 2023. He has been held in custody since his arrest. From the outset, Mr. Tate communicated through counsel that he wished

to accept responsibility for his conduct. To that end, Mr. Tate entered into a plea agreement and the government filed a three-count Information on February 20, 2024, charging Mr. Tate with three counts of assaulting, restricting, or impeding certain officers using a dangerous weapon in violation of 18 U.S.C. § 111(a)(1) and (b). This Court held a plea hearing on March 7, 2024, in which Mr. Tate acknowledged his actions on January 6.

## II.   LEGAL STANDARD

This Court has broad discretion to impose a sentence less stringent than the one suggested by the Guidelines. Nearly twenty years after the Supreme Court's decision in *United States v. Booker*, it is now "emphatically clear" that the "[g]uidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). *See also Kimbrough v. United States*, 552 U.S. 85 (2007) (Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. § 3553(a)); *Gall v. United States*, 552 U.S. 38 (2007) (same). Courts must consider the Guideline range as just one of more than a half dozen statutory sentencing factors enumerated in 18 U.S.C. § 3553(a).

Section 3553(a) provides that the Court must consider:

>    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>    (2) the need for the sentence imposed—
>
>>    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>    (B) to afford adequate deterrence to criminal conduct;
>>    (C) to protect the public from further crimes of the defendant; and
>>    (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner
>
>    (3) the kinds of sentences available;
>
>    (4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines— (i)issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; …

(5) any pertinent policy statement— …

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661.

Congress has further provided that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

18 U.S.C. § 3582(a) (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." *Id*. § 3553(a) (emphasis added).

Importantly, the Supreme Court has reiterated that in imposing sentence, "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 477 (2011) (emphasis added). Sentencing courts are encouraged to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020) ("But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for.").

## III.   THE SENTENCING FACTORS SUPPORT THE REQUESTED SENTENCE.

### A.  Mr. Tate's history and characteristics support a 36-month sentence.

Curtis Logan Tate was born in New Albany, Indiana to Paul Tate and Susan Gum. He is currently 33 years old. Mr. Tate's parents separated when he was very young and his mother raised him. While growing up, although his father was permitted visits after Mr. Tate was around three years old, Mr. Tate's mother did not encourage, and even discouraged, Mr. Tate from having a relationship with his father. *See* Ex. A at 3 (Letter of Dannion Tate) ("The more I got older the more I realize that she was using him against my dad."); *id*. at 5 (Letter of Jansen Tate) ("From a young age his mother used him as a bargaining tool against my father."); *id*. at 16 (Letter of Lori

Tomes) ("Logan's mother made it very hard for him to see his dad on and off for years."). As a result, he had a strained relationship with his father as a child. Mr. Tate is the oldest child and has two half siblings on his mother's side and two on his father's. Growing up, Mr. Tate repeatedly had father-figures and other potential role models filtering in and out of his life. He had no consistent father-figure, but instead faced the repeated loss of male role models. His family describes his childhood as riddled with loss, both of these father figures and of his grandmother, who helped raise Mr. Tate and with whom he was extremely close. *Id*. at 28 (Letter of Suzanne Gum) ("It seems throughout Logan's life he has had many people come in and out of his life or he loses the people he was the closest to.").

Despite these losses, Mr. Tate held an important role in his siblings lives. It is clear from their letters that Mr. Tate was a caring and active older brother. *Id*. at 3 (Letter of Dannion Tate) ("My brother Jansen and I grew up with Logan our entire lives. . . . Some of the best memories that I have include him right there next to me whether it be fishing, playing in our backyard when we were growing up."); *id*. at 5 (Letter of Jansen Tate) ("I remember being 5 or 6 years old on a lake dock while Logan was teaching me the best spots to cast if I wanted to catch bluegill. I remember going to public parks and playing all over the slides and the jungle gyms. I remember him coming to my little league games and helping my dad teach me to ride a bike. I remember him taking my older brother and I through the hay barns and the corn fields on our family's property.").

 

Notwithstanding whatever Mr. Tate was going through in his own life, he did not let it affect his relationship with his siblings.  When he was just 16 years old, Mr. Tate moved out of his mother's home and spent some time couch surfing between friends and his biological father.  Mr. Tate never fully developed a relationship with his father and he passed away from a heart attack in 2015, when Mr. Tate was in his early 20s.

Growing up, Mr. Tate also struggled in school and acted out. He was expelled from school in the 10th grade, but Mr. Tate enrolled in a course to receive his general education diploma (GED). Since receiving his GED, Mr. Tate has worked as a heavy machine operator, nursing assistant, and personal trainer. Most recently, Mr. Tate became a certified insurance salesman. *Id.* at 32 (Letter of Tim Hancock) ("Logan was licensed and worked as a Certified Nurse Assistant (CNA) and licensed insurance producer (sales).").

Mr. Tate's challenges growing up led him to drugs and alcohol. Mr. Tate started drinking alcohol at the extremely young age of 11 and he abused alcohol his entire life, until his recent treatment at The Healing Place, which has resulted in over a year of sobriety at this point. In addition to alcohol, Mr. Tate regularly used marijuana and cocaine.  For the last few years prior to his sobriety, Mr. Tate used cocaine regularly. He has now been sober for a year and is dedicated to maintaining his sobriety moving forward. Part of Mr. Tate's struggles with addiction stemmed

from his prior romantic relationship. He is currently separated from his husband, but during their relationship, they would often abuse drugs and alcohol together. When they were inebriated their relationship turned volatile and Mr. Tate frequently was the victim of both physical and emotional abuse from his husband. *Id*. at 24 (Letter of Megan Goins) ("During his hospitalization, Logan opened up about his toxic relationship with Justin, the cheating that had occurred, the use of drugs (cocaine, crack, marijuana) with Justen, and how Justen made it seem like my mother and I were the 'bad people' in Logan's life. Once hearing this information, it really seemed like Logan fell into a controlling, narcissistic relationship.").

Mr. Tate has also suffered from mental health issues, but never received the treatment or support he needed. In January 2023, Mr. Tate was riddled by addiction and suffering from severe depression, eventually leading him to the decision to take his own life. He sent text messages to his family and said his goodbyes and he shot himself in the chest. *Id*. at 24 (Letter from Megan Goins) ("On January 20, 2023, Logan sent myself, my mother, Tim Hancock, and Justen suicide text messages explaining how he loved us, but he couldn't go on anymore. Logan shot himself in his middle chest, barely missing his heart and spine causing a left-sided pneumothorax, a collapsed lung on the left side."). Fortunately for Mr. Tate, he survived his suicide attempt and that action brought him closer to Mr. Hancock and his family, who worked to do what they could to put Mr. Tate on a better path. *Id*. at 33 (Letter of Tim Hancock) ("I was stunned to receive a text from Logan telling me of his plan to commit suicide. I along with his and my family did what we could to support Logan after."). He researched drug treatment providers and found himself a place at The Healing Place in Wilmington, North Carolina. He entered the treatment program on February 18, 2023, and was arrested from treatment in August 2023.

While in the Healing Place, Mr. Tate focused on healing. Those who encountered him there explain that he "transform[ed] from a self-pitying victim into a man of radical responsibility and dignity." *Id*. at 1 (Letter of Anthony Harvey). At the Healing Place, Mr. Tate not only focused on his recovery, but he also contributed to the experience of others. *Id*. at 10 (Letter of Joanne Lee) ("One of Curtis's notable contributions was the inititation of an exercise group for clients. . . . His leadership and willingness to help new clients acclimate to the program were exemplary. Curtis also frequently assisted staff members when opportunities arose, showcasing his cooperative spirit and reliability.").

Getting and remaining sober has changed Mr. Tate's life. During his time at the Healing Place, Mr. Tate reflected on his action and recognized the harm and error of his decisions. He is dedicated to moving forward with his life. His acceptance of responsibility through the plea and with his friends and family ensures that he has the support and accountability moving forward. *Id*. at 8 (Letter of Jansen Tate) ("I remember he told me that looking back on it he is extremely ashamed. He mentioned that he let other people's rhetoric cloud his mind and misguide his judgment. He explained that in hindsight he wishes he had never traveled to DC."); *id*. at 12 (Letter of Joe Goins) ("Curtis has expressed genuine remorse for the events that transpired, and I know he is determined to a reformed life, which he is already living."); *id*. at 17 (Letter of Lori Tomes) ("He knows he has done wrong and is very remorseful, as he has told me.").

He hopes to take advantage of classes while in the Bureau of Prisons, potentially getting his barber certificate and working with animals. While incarcerated at the D.C. Jail, Mr. Tate has been assisting his pod mates by providing barber services. He also has always had a passion for animals. Prior to his arrest, Mr. Tate had two dogs, one of which is currently being cared for by his family.

 

Mr. Tate is so much more than his actions on January 6. His personal determination to overcome his addiction and turn his life around since these events and after his suicide attempt shows that he has the drive and ability to forge a better path. Despite the challenges of maintaining sobriety and the stresses of the D.C. Jail, Mr. Tate has remained clean and even worked to develop a positive relationship with other individuals in his unit and the staff at the D.C. Jail. He has been approved to be a mentor in the D.C. Jail Residential Mentoring Program and is on detail in his unit. *See* Ex. B (Letter re Mentoring Program). Additionally, he independently organizes group workouts and AA meetings. *See* Ex. A at 9 (Letter of Jansen Tate) ("He has taken several people under his wind and taught them what he knows about proper exercise and nutrition.").

A sentence of 36 months is sufficient but not greater than necessary when the Court considers Mr. Tate's history and characteristics.

**B. Mr. Tate's assault on officers was rash and unplanned and occurred amidst a chaotic scene.**

In the days leading up to January 6, Mr. Tate and his then-husband decided to travel to Washington, D.C. to support President Trump and attend the Stop the Steal rally. Neither Mr. Tate, nor his husband were a member of any group or planned with others to engage in any actions on January 6. Mr. Tate did not plan to attend the rally or go to Washington, D.C. to engage in any violence or destruction. Although Mr. Tate brought a baton with him to Washington, D.C., he did not intend to use it, but brought it because he had been told by others that Trump rallies often encounter counter-protestors and he wanted to be able to protect himself. Mr. Tate understands now that the information he was provided was not correct and, regardless of his lack of intent to use the baton, he never should have brought it with him.

Mr. Tate went to the Stop the Steal rally and gathered with the other individuals present that day to listen to then-President Trump's speech. Following the rally, Mr. Tate walked with the thousands of others towards the Capitol. As this Court is unfortunately more than aware, the scene at the Capitol was unprecedented and chaotic.

In 2020 and 2021, Mr. Tate was at a low point in his life. He was emotionally and mentally lost. He became interested and involved in politics as an area to cling to for purpose and meaning. But this time in his life was dominated by his addiction. His choices were dictated by his addiction and mental health struggles. It is within that backdrop of personal instability that Mr. Tate arrived at the Capitol and joined the mob. He was easily impacted by the crowd and the chaos and allowed himself to become a part of harm caused that day. Being caught up in a group like the one created on January 6 is intoxicating and Mr. Tate was someone who was easily influenced and driven toward such a feeling of intoxication.

Since January 6, Mr. Tate has watched videos of his actions with counsel and he is sincerely remorseful and regretful for the actions that he took on that day. They do not reflect the person he is and especially do not reflect the progress he has made in his life over the last year and a half.

When Mr. Tate was standing outside the tunnel, and immediately after he threw the black speaker box and struck the window, he saw a woman on the ground in physical distress. As a trained nurse, Mr. Tate sought to provide aid. He and other protestors pulled her out of direct area where protestors were engaging with police, placed her on a stair where they could assess her injuries, and rolled her onto her back. At this point other protestors jumped in to try to provide life saving care and Mr. Tate stood nearby to give them some space to work. He later learned that the woman was Rosanne Boyland and she died, very likely, at the time that he was attempting to come to her aid. Screenshots capturing Mr. Tate assisting in moving Ms. Boyland to safety are below.





*Screen shots of Mr. Tate coming to the aid of woman later identified as Ms. Boyland.*

After it was clear Ms. Boyland could not resuscitated, other protestors attempted to lift her into the tunnel. At this point, frustrated and under extreme stress, Mr. Tate acted in anger, throwing various objects towards and into the tunnel. He left the Capitol shortly after.

Mr. Tate in no way attempts to claim that his anger about what happened to Ms. Boyland justified his actions or even mitigates the decisions he made. But it does provide some context for his later actions of throwing items into the tunnel.

Overall, Mr. Tate acknowledges and accepts responsibility for all of his actions on January 6. He is ashamed of his conduct and dedicated to moving forward on a positive path upon his release.

**C. The applicable sentencing enhancements for dangerous weapon and conviction under § 111(b) and assault on an officer effectively result in double counting and over-represent the severity of the conduct, justifying a downward variance under 18 U.S.C. § 3553(a).**

Sentencing courts have broad discretion to vary from the sentencing guidelines and may do so based on policy considerations, including disagreements with the guidelines. *See United States v. Booker*, 543 U.S. 220, 244 (2005). In this case, the applicable guidelines to the conduct underlying the assault against officers in violation of 18 U.S.C. § 111(a)(1) and (b) create an unreasonably harsh sentence. While Mr. Tate does not object to the applications of the enhancements and base offense level agreed to in the plea agreement, the Court should vary downward because application of these enhancements and the resulting guideline range in this case over-represents the seriousness of Mr. Tate's conduct. 18 U.S.C. § 3553(a)(1). Additionally, the guidelines' arbitrary application of USSG § 2A2.2 for aggravated assault against an officer and USSG § 2A2.4 for simple assault against an officer creates dramatic sentencing disparities for the exact same conduct.

**i. The applicable sentencing enhancements for use of a dangerous weapon and conviction under 18 U.S.C. § 111(b) results in double counting and over-represents the severity of the conduct**.

Mr. Tate's use of a baton is used twice to trigger an unreasonably high total offense level—first, because he receives a four-level enhancement under USSG § 2A2.2(b)(2), and second, because he receives another two-level enhancement for having been convicted under 18 U.S.C. § 111(b), resulting in a total increase of six levels. As the Court is surely aware, many January 6 defendants—including defendants convicted of using a hockey stick and pyrotechnic devices as weapons—were convicted under 18 U.S.C. § 111(a) and *did no*t receive the two-level increase under § 2A2.2(b)(7). But because Mr. Tate was convicted under § 111(b), he receives a two-level offense increase for the same conduct. In other words, he arbitrarily receives a two-level increase

because the government would not permit him to plead guilty to § 111(a). The Court should consider this arbitrary increase to the offense level and vary downward under the § 3553(a) factors.

### ii.   The official victim enhancement adds another six-level enhancement resulting in a guideline range which overstates the severity of the conduct.

On top of the six levels for dangerous weapon, Mr. Tate agreed to an additional six-level upward adjustment under USSG § 3A1.2(c)(1), Official Victim. Section 3A1.2(c)(1) permits an upward adjustment for conduct that creates "a substantial risk of serious bodily injury" to a law enforcement officer that the defendant knew or had reasonable cause to believe was a law enforcement officer. Notably, § 111 specifically targets conduct against officers or employees of the United States while they are engaged in, or on account of, the performance of their official duties, *see* 18 U.S.C. § 111, and Mr. Tate receives a two-level increase for having been convicted under § 111(b). Thus, application of the Official Victim adjustment increases Mr. Tate's base offense level by six levels, even though two prior enhancements already target and punish the same conduct—that a dangerous weapon was used towards an officer while he was engaged in the performance of his official duties.

Without the official victim enhancement, which is duplicative of the use of a dangerous weapon and § 111(b) enhancements, Mr. Tate would be at offense level 20, with a guidelines range of 33-41 months incarceration. Mr. Tate's request for a variance to 36 months incarceration puts him squarely within the applicable Guideline if one of the duplicative enhancements were not applied.

### D.   A sentence below what the government is seeking would avoid unwarranted disparities.

A sentence below what the government has requested will promote respect for the law and avoid unwarranted disparity. Similarly situated January 6 cases have received considerably less

than what the government has requested in most, but not all, cases. A sampling of the most serious

cases with similar conduct follows:

- *US v. Kevin Creek*, 21-cr-645 (DLF): Mr. Creek was sentenced to 27 months' incarceration after pleading guilty to one count of Assault on a Police Officer. Mr. Creek admitted to hitting a police officer in the face shield of his helmet to try to get past a bike rack barrier. He also admitted to shoving and kicking another officer causing him to fall to the ground. While he entered a guilty plea, he allegedly denied the conduct to which he pled guilty and did not express remorse for his actions.

- *US v. Scott Fairlamb*, 21-cr-120 (RCL): Mr. Fairlamb was sentenced to 41 months' incarceration after he pled guilty to 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a). Mr. Fairlamb not only entered the Capitol building but found a police baton that he used to encourage the crowd to storm the building and to "disarm" the police. He then shoved a police officer and punched him in the face. Mr. Fairlamb told the FBI after January 6, 2021, that he would go again. Notably, the government also accused Mr. Fairlamb of destroying evidence from his phone.

- *US v. Michael Perkins*, 21-cr-447 (CJN): Defendant Perkins proceeded to a bench trial and in addition to being convicted of Civil Disorder, was also convicted of Assault with a deadly weapon. He was sentenced to 48 months' incarceration. The Court in Perkins rejected the government's high recommendation of 90 months' incarceration. Mr. Perkins was found guilty of using a flagpole to assault officers, including kicking an officer who had fallen to the ground. Like Mr. Sturgeon, Mr. Perkins' background and history favored a variant sentence.

- *US v. Duke Wilson,* 21-cr-345 (RCL): Mr. Wilson was sentenced to 51 months' incarceration after pleading guilty to Obstruction of an Official Proceeding and Assault on an Officer. Mr. Wilson was involved in the lower west terrace assaults and admitted to using a metal pipe to strike a police officer – which resulted in the officer being injured. Mr. Wilson also admitted to trying to open the door that police were furiously trying to shut while rioters were trying to fight their way in.

- *US v. David Blair*, 21-cr-186 (PLF): Blair, who carried a large confederate flag and a backpack containing a knife and duct tape, and pushed a large lacrosse stick against a police officer's chest while yelling that he would not submit to commands, pleaded guilty to civil disorder (231) and was sentenced to five months.[1]

- *US v. Devlyn Thompson*, 21-cr-461 (RCL): Thompson pleaded guilty to assault (111(b)) after exhorting officers to fight one-on-one, passing out riot shields to rioters and encouraging them to use the shields as weapons against the officers, spraying bear spray at officers, throwing a large box speaker at the police line, assaulting a police officer with a metal police baton, and remaining in the tunnel for more than 13 minutes.[2] He was among the first of the rioters to arrive on the inaugural stage, and he was one of the last to leave. For these numerous assaults over an extended period, he was sentenced to 46 months.

- *US v. Marshall Neefe*, 21-CR-567 (RCL): Neefe pleaded guilty to obstruction of justice and assault (111(a)) after coordinating and planning for weeks ahead to travel to D.C. to violently ensure that President Trump would stay in power. As

---

[1] *United States v. David Blair*, 1:21CR186 (PLF), ECF. No. 55, Government's Sentencing Memorandum.

[2] *Unites States v. Devlyn Thompson*, 1:21CR461 (RCL), ECF. No. 10, Statement of Offense.

part of the plan, Neefe fabricated a wooden club—which he named the "Commie

Knocker"—that he carried to Capitol grounds. At the Capitol, he participated with

others to thrust a large metal sign into a line of law enforcement. Once he broke the

line, he entered the Capitol building and spent 40 minutes inside. After January 6,

through Facebook, he expressed pride about getting tear gassed and breaching the

Capitol. At his sentencing, the government identified three police officer victims of

his assault.[3] For all of this, he was sentenced to 41 months.

- *US v. Alan Byerly* 21-cr-257 (RDM): Byerly was charged with assault (111(b)) for

   assaulting several officers with a taser, but pleaded guilty to assault (111(a)) and

   striking another person (113) for assaulting a reporter. According to the

   government, Byerly engaged in three separate assaults—he activated a stun gun on

   one police officer and, when it was taken by officers, he physically struck them and

   pushed against them, grabbing an officer's baton; he assaulted a group of officers

   using an enormous, all-metal Trump billboard with sharp edges that was capable of

   splitting someone's head open as a battering ram; and he viciously assaulted a

   member of the press, dragging him up and down the staircase. As the government

   described it, "Byerly grabbed the victim with both hands near the victim's shoulder

   and upper chest and pushed him backward. Byerly then pushed and dragged the

   victim past the site of the original altercation and towards a dense crowd. Byerly

   eventually placed both of his hands in the area of the victim's face and neck and

   continued to shove and push the victim away from the stairs, and toward a low

---

[3] *United States v. Marshall Neefe*, 1:21CR567 (RCL), ECF. No. 84, Government's Sentencing
Memorandum.

stone wall that separated the stairs of the West Front of the Capitol Building from the west lawn below." For all of this, Byerly was sentenced to 34 months.[4]

- *US v. Ricky Wilden,* 21-cr-423 (RC); Wilden, a member of the Proud Boys, assaulted numerous police officers with a chemical irritant while he wore goggles that he had brought with him and then threw the canister at the officers before entering the Capitol. After January 6, he deleted Facebook messages and videos.[5] At the time of his sentencing, he had a pending charge for felony assault of his spouse with a deadly weapon and was using illegal substances while on release. Despite assaulting officers with a chemical irritant and the empty canister, he was not required to plead to the more serious assault charge and did not receive the dangerous weapon enhancement. He was sentenced to 24 months.

- *US v. David Judd,* 21-cr-40 (TNM): Judd was found guilty after a stipulated trial of obstruction (1512) and assault (111(a)). According to the government, Judd was fully aware of the certification process, intended to disrupt the activities of Congress before coming to D.C., and "acted as an on-the-ground commander of other rioters, directing, encouraging, and instigating the violence, chaos, and destruction in and around the tunnel . . . yelling commands to organize rioters, passing items into the tunnel to be used as weapons."[6] He then joined in coordinated pushes against the police line and lit a pyrotechnic device and threw it at the police

---

[4] *United States v. Alan Byerly*, 1:21CR257 (RDM), ECF. No. 46, Government's Sentencing Memorandum.

[5] *United States v. Ricky Wilden,* 1:21CR423 (RC), ECF. No. 36, Government's Sentencing Memorandum.

[6] *United States v. David Lee Judd*, 1:21CR40 (TNM), ECF. No. 527, Government's Sentencing Memorandum.

line.[7] The government characterized his conduct as "some of the most aggravating conduct that we've seen on January 6th."[8] Judd received the dangerous weapon enhancement and the Court found that Judd intended to cause bodily injury by throwing the firecracker, but the Court disagreed with the guideline range of 78 to 97 months proposed by the government and probation and found a range of 37 to 46 months and then varied downward to impose a sentence of 32 months, finding the "advisory guideline produces an advisory sentence that is overly harsh."[9]

- *US v. Matthew Miller*, 21-cr-75 (RDM): Miller pleaded guilty to assault (111(a)) and obstruction (1512) after he threw beer cans and batteries at officers and unleashed the contents of a fire extinguisher on more than a dozen officers as other rioters were assaulting them, causing at least six officers to experience "smoke" or "unknown fog." One officer said the "smoke" impaired his vision; another said it burned his skin. For all of this, Miller was sentenced to 33 months.[10]

- *US v. Clifford Mackrell*, 21-cr-276 (CKK): According to the government, Mackrell traveled to the rally "outfitted for battle" wearing gas masks and heavy gloves. Mackrell admitted to multiple assaults, including striking and pushing officers and

---

[7] *Id.*

[8] Sentencing Hearing Transcript at p. 17; *See also,* Tr. at 26 (seeking a terrorism enhancement, the government represented "the degree of his conduct was so great, and his intent there was so great, coupled with all of his other actions in the tunnel, which include directing the rioters, passing the shields in, passing the crutch in, telling people were to go, engaging in the heave-ho himself, this Defendant did it all, and he did it over the course of a long period of time."); Tr. at 53 ("looking at all of the January 6 rioters, I think this Defendant is at the high end of them also.")

[9] The Court found the guideline range to be lower because it did not apply the 2J1.2 "administration of justice" enhancements, later found to by the D.C. Circuit to be inapplicable in *United States v. Brock.*

[10] 1:21CR75 (RDM), ECF. No. 67, Government's Sentencing Memorandum.

pulling at an officer's gas mask. One officer victim testified at the sentencing hearing that Mackrell stuck his finger in his eye. Mackrell also admitted to using plywood to push against officers who were trying protect the Capitol.[11] For these multiple assaults, Mackrell received a sentence of 27 months.

These cases demonstrate that the sentence requested by the government and recommended by Probation is greater than necessary. Comparing Mr. Tate's behavior to the panoply of January 6 defendants, his conduct was certainly more serious than many who wandered through the Capitol, but is less serious than those who planned to engage in violence, and as serious as many individuals like those above who received sentences below that requested by the government or recommended by Probation. Additionally, the JSIN demonstrates that the average sentence for individuals under the same sentencing Guideline and in the same guidelines range is well below that recommended by Probation. *See* PSR ¶ 167, ECF No. 33. The requested sentence of 36 months, although below the JSIN average, accounts for Mr. Tate's actions since January 6 to overcome his addiction and correct his path in life.

**E.  The requested sentence will achieve the goals of sentencing.**

In addition to incarceration, Mr. Tate will serve a lengthy term of supervised release and pay mandatory restitution. And for the rest of his life, he will be hampered by a felony conviction. Mr. Tate knows he brought this cascade of consequences onto himself. However, a lengthy prison sentence exceeds what is needed to achieve the goals of sentencing.

As for deterrence, Mr. Tate's action in rebuilding his life shows that he is on a different track than he was on January 6 and that he is able to turn his life around. As for general deterrence, research has consistently shown that while the certainty of being caught and punished has a

---

[11] 1:21CR276 (CKK), ECF. No. 101, Government's Sentencing Memorandum.

deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[12] In short, there is little empirical support for the prospect that a period of confinement will be any more effective at deterring Mr. Tate or others from committing similar offenses.

Sentencing Mr. Tate to a significant period of incarceration is not the way to ensure that the isolated events on January 6 will never occur again. An event like January 6 is unlikely to happen again. Empirical evidence proves that the certainty of prosecution, rather than the severity of the punishment is the greater deterrent.[13]

No more than 36 months incarceration followed by supervision is needed to achieve the goals of sentencing.

### F.  Mr. Tate does not have the means to pay a fine.

Mr. Tate agrees with the Presentence Report that he does not have the means to pay a fine. *See* PSR ¶ 137. He was unemployed when he was arrested in August 2023 because he was in a

---

[12] Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. OF RSCH. IN CRIME AND DELINQ. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay*, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

[13] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence.

rehabilitation program and he has been incarcerated for the past 11 months. Although Mr. Tate's sister created a fundraising page to attempt to raise some money so that Mr. Tate could communicate with friends and family while incarcerated, his dog could be cared for while he was incarcerated, and hopefully he would have a small amount of money to start rebuilding his life upon release, that does not mean he has the ability to pay a fine. An individual with only $10,000 total to their name does not have the ability to pay a fine, regardless of where that money came from.

**G. Mr. Tate's restitution for the window should be joint and several.**

Mr. Shane Jenkins, No. 21-cr-245, was also convicted of damaging the exact same window as Mr. Tate and ordered to pay the same amount in restitution to repair or replace the window. While restitution is mandatory to make the victim, in this case the Architect of the Capitol, whole, the victim is not entitled to duplicate damages. Joint and several liability is commonly used by the Court when the same harm is caused by multiple individuals. The victim is made whole once, not repeatedly because multiple individuals caused the harm. It is not required that the defendants be charged in the same indictment for joint and several liability to apply. *See, e.g., United States v. Fareri*, No. 09-cr-54 (EGS), ECF No. 215 at 7 (Dec. 17, 2018) (ordering restitution joint and several with two other defendants charged in two different criminal cases). Mr. Tate's restitution for the window should be joint and several with Mr. Jenkins and any other individual who is convicted of damaging the window in Room ST-2M.

IV.     **CONCLUSION.**

For the foregoing reasons, and such other reasons as may be presented at the sentencing hearing, Mr. Tate respectfully requests that the Court impose a sentence of 36 months incarceration.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Diane Shrewsbury
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500